*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

PAUL DRUM TEBBEN,

      Defendant-Appellant.

UNPUBLISHED
September 30, 2025
1:08 PM

No. 369366
Lapeer Circuit Court
LC No. 2021-014097-FH

Before: LETICA, P.J., and RICK and BAZZI, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions for first-degree home invasion, MCL 750.110a(2), and assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12(1)(a), to concurrent terms of 25 to 40 years' imprisonment for both offenses. We affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

The charges arose from an assault that occurred on June 1, 2019, when the 50-year-old defendant entered the 66-year-old victim's camper and assaulted him. The victim, who, at times, used a breathing apparatus for oxygen, was friends with Muriel Keeley (Keeley), defendant's 70-year-old mother, who lived in a nearby trailer. Defendant stayed in another trailer across the street from the victim.

On May 31, 2019, the victim went for a golf cart ride with Keeley. They then returned to his camper and had a couple of beers. The victim also smoked some marijuana.[1] The victim may have patted Keeley on the butt that day; however, at trial, the victim testified that the pair did not really have a romantic relationship despite flirting with one another.

---

[1] On cross-examination, the victim was impeached with his preliminary examination testimony denying that he had smoked marijuana.

-1-

Eventually, Keeley returned to her trailer and the victim went into his camper to cook dinner. After eating, the victim laid down on his couch at about 10:30 p.m. and fell asleep. The victim's solid front door was closed, but he had not locked it.

At trial, the victim testified that he was awakened by the sound of defendant opening his camper door and walking inside. Before the victim could say anything, defendant grabbed him by his neck, dragged him off the couch onto the floor, and knelt on his chest. Defendant then beat the victim for about five minutes with his hands and fists, severely injuring him. The victim further testified that defendant walked into his trailer without knocking or asking for permission.[2]

After defendant left, the victim noted that it was 3:00 a.m., and he drank some alcohol because he was in pain. The victim locked his front door and attempted to go back to sleep.

By 7:30 or 8:00 a.m., the victim called Keeley, told her that defendant had assaulted him, and asked her to drive him to the hospital, which she did. The victim's left arm was broken in two places. The victim also had bruising on his eyes, face, neck, and chest along with a cut on his forehead and two cracked ribs.[3]

At the hospital, the victim reported being assaulted by "his girlfriend[']s son" and a "known assailant." The victim also said that he was "aware of who attacked him, but [did] not want to disclose the information at this time." The hospital records reflected that the victim had a "ride home with [his] girlfriend, who [was] currently at [his] bedside" and "will watch him closely for the next 24 hours." However, the victim testified that Keeley left the hospital to go pick up her grandson, returned later to pick him up, and took him back to his camper.

In the interim, the hospital staff contacted the Lapeer County Sheriff's Department and Deputy Craig Ross responded to the hospital. The victim informed Deputy Ross that he was reluctant to prosecute, reporting that he had been "jumped" and did not know by whom.

Nevertheless, Deputy Ross learned the name "Paul" and went to the campground to ask about him. There, Deputy Ross encountered Keeley, who confirmed that defendant was her son, and gave Deputy Ross a phone number that purportedly belonged to defendant. Deputy Ross attempted to call that number a couple of times without response. And, because the victim did not want to pursue charges, nothing happened.

By June 14, 2019, however, the victim changed his mind and Deputy Ross came out to take his statement. Deputy Ross also photographed the area, the victim's injuries, and the condition of the victim's camper. Photographs from inside the victim's camper showed blood spatter on the blinds behind the couch, on a cabinet directly above the couch, and on the inside of

---

[2] On cross-examination, the victim was impeached with his preliminary examination testimony that he saw defendant as he came to the door.

[3] The victim's medical records were admitted during trial.

the entry door. The victim reported that defendant assaulted him and said something like: "Leave my mom alone." Thereafter, defendant was charged.

Before trial, defense counsel filed a notice of intent to assert an insanity defense because of defendant's post-traumatic stress disorder (PTSD)[4] and also moved for a competency examination. Dr. Corissa Carlson from the Forensic Center conducted defendant's competency and criminal responsibility examinations and concluded that defendant was competent to stand trial and aware of his conduct during the assault.

Once trial began, the trial court issued a sequestration order. It was brought to the court's attention that Keeley, defendant's witness, was present for defense counsel's cross-examination and the prosecutor's redirect examination of the victim, for Deputy Ross's testimony, and for defense counsel's opening statement on the third day of trial. In lieu of striking Keeley as a witness and as requested by defense counsel, the trial court opted to instruct the jury about the violation of its sequestration order and that it could be considered by the jury when it determined Keeley's credibility.

During trial, Keeley testified that defendant had spent time talking with the victim in the victim's camper a couple of times. Keeley also testified that the victim drank heavily and that in the two weeks before the assault, defendant had informed the victim to "please stay away from her" because he knew she was having a difficult time following the suicide of her partner in January 2019. According to Keeley, defendant cautioned the victim more than once.

Keeley further testified that there was a day that the victim invited Keeley and her friend to drink some of his fresh lemonade, which he used to mix with vodka. When they joined him, the victim grabbed Keeley's butt and she slapped him, stating that he had better hope that defendant had not seen this interaction. The victim remarked that he thought that defendant had seen it and Keeley quickly left the area. Keeley further testified that she was older than the victim and did not encourage his behavior.[5]

On May 31, 2019, Keeley saw the victim at around 3:00 p.m. He was on a golf cart and fell off it due to his intoxication. Thereafter, he went inside a store and was kicked out because he "flipped a cigarette" while he had his oxygen tank.

The following day, the victim called Keeley asking if she could take him to the hospital because he was too drunk to do so himself. When Keeley asked what had happened, the victim responded that someone had beat him up. Keeley drove the victim to the hospital. She was at the hospital for only ten to fifteen minutes because she had leave to care for her grandson. Keeley denied telling people at the hospital that she was the victim's girlfriend and denied picking the victim up from the hospital.

---

[4] Defendant was diagnosed with PTSD on May 17, 2022.

[5] During his testimony, the victim denied that Keeley had ever asked him not to follow her around, not to touch her, or to stay away from her. Nor did Keeley yell at him for touching her.

When Deputy Ross met with Keeley on the day of the assault, she did not tell him that the victim had touched her butt or that she felt threatened by the victim. Further, Keeley did not tell Deputy Ross that the victim fired guns. And, if Keeley had misspelled her name for Deputy Ross at the hospital,[6] she did so accidentally because she could not speak well. Similarly, if she gave Deputy Ross an incorrect phone number for defendant, she did not know it was incorrect because she could not remember phone numbers. Keeley admitted that she had looked for defendant's number on her phone; however, she did not have her glasses on. Keeley gave Deputy Ross's card to defendant, explaining that the deputy wanted to talk with defendant.

Between June 1 and 7, 2019, Keeley sent defendant a text. It read:

Half your drinking makes you mean. I have bruises on me. I'm trying to get better. I'm so sorry I'm this way. I try to help you. Nobody can.

Defendant also sent Keeley a text on June 6, 2019; it said: Poor [Keeley], want everyone to feel sorry for you and you worry [the victim]. Really?" Keeley did not remember receiving that text. Nor did Keeley remember texting defendant: "No. She didn't. Everybody here knows what you did." Keeley explained that last statement in her text, saying that "there was talk."

Defendant also testified. Defendant moved into the campground at the end of April or in May of 2019, and he and Keeley became "reacquainted[.]" Defendant described playing cards with and barbecuing with the victim.[7] Defendant was also worried about Keeley, from whom he had been estranged, because her boyfriend had committed suicide. Defendant even moved closer to the victim's camper to see what was happening between Keeley and the victim. According to defendant, he was concerned because he heard screaming a couple of times from Keeley's camper and then saw her chasing the victim out. The victim appeared intoxicated. Defendant also witnessed one occasion where the victim inappropriately touched Keeley and she smacked him. Defendant explained that the victim wanted to know why he could not accompany Keeley when she got on a golf cart, smoked marijuana, and hung out at others' campsites. On June 1, 2019, at around midnight or 12:30 a.m., defendant had a long conversation with Keeley during which she shared that she was not interested in engaging in a romantic relationship with the victim.

Defendant then went to the victim's camper and the victim, who was awake, allowed him inside. At that time, the victim confirmed that there was no intimate relationship between Keeley and him. Defendant left.

Defendant returned to Keeley's camper. Keeley also confirmed that there was no intimate relationship between the victim and her.

---

[6] Deputy Ross testified that Keeley spelled her name as "Kalley" at the hospital.

[7] Contrary to defendant's and Keeley's testimony, the victim testified that defendant had never been in his trailer, that he had never invited defendant inside, and that defendant had never been there for a barbeque. However, the victim admitted that defendant had been on his camper's deck and helped him clean up his yard.

Even so, defendant went back to the victim's camper. Defendant testified that the victim was awake and again allowed him to enter. Defendant proceeded to express his views on what he thought was the victim's "imaginary relationship of some kind of relationship[.]" Defendant was worried about Keeley's well-being and thought the victim "was stalking, creeping [on Keeley] and freaking her out. . . ." Specifically, the victim had walked into Keeley's trailer a couple of times and touched her inappropriately. Defendant informed the victim that he wanted the victim to stay away from Keeley.[8]

According to defendant, the victim's demeanor then changed and the victim expressed that he and Keeley were about to start a relationship. As defendant turned to leave, he heard steps and the clicking sound of what he believed was the "safety or rack of a gun."[9] Defendant testified that a gun was "at [his] head or supposedly a gun." Defendant, who was 6' 5" and weighed 285 pounds, reacted in self-defense.[10] Defendant perceived that the victim pointed a gun at him. This caused defendant to recall his time of service in the Navy from 1986 to 1990. Defendant "blacked out temporarily" and did not remember hitting the victim, he only remembered using his right arm and getting to the door. Defendant had no idea how the victim was injured. Defendant described how "[t]here's a tight spot there" and how he didn't know if [the victim] went flying." Defendant later returned home and "broke down[.]" Defendant "locked [his] door" and "looked over a few times, [to] see if [the victim] was coming or not." Defendant did not know if the victim wanted to "have a shootout or what's going on[.]"

Defendant admitted that he initially lied to the police about his involvement in the assault, informing them that he was not at the campground. More specifically, defendant told the police that he left the campground at 9:00 p.m. on May 31, 2019, and arrived at his Imlay City home at 10:00 p.m. Defendant added that the police could talk with his girlfriend, who would provide an alibi for him.

Defendant did not remember telling the police that another person heard Keeley admit that she had assaulted the victim. Even so, defendant later testified that he had heard that the victim got jumped and Keeley had done it. Defendant reported that Keeley had several brothers, had previously assaulted another man, and fought "like a man." Keeley explained that she had jokingly made a statement that she was responsible for the victim's assault during a campfire.

Defendant, who was on probation, admitted that he never previously told the police about blacking out or that the victim pulled out a gun. During defendant's redirect testimony, however,

---

[8] During the victim's testimony, he denied that these types of conversations occurred.

[9] The victim denied pulling a gun on defendant. But Keeley testified that the victim had a high-powered pellet gun that he used to shoot at a speed limit sign or kill neighborhood squirrels and chipmunks. Contrarily, the victim testified that he had a BB gun in his trailer; however, he could not recall if the BB gun was inside his camper in 2019. The victim did admit to using the BB gun to shoot chipmunks, but denied using it to shoot squirrels or signs.

[10] The victim was 6' 2" and weighed approximately 180 pounds.

he mentioned telling a "[p]sychiatrist"[11] about the victim pulling a gun on him, blacking out, and his PTSD. On recross-examination, defendant repeatedly testified about his "diagnosis of a hundred percent service-connected PTSD[,]" which was made in May 2022. Defendant further testified that he was "on some major medications for [his] hundred percent service-connected PTSD." In fact, defendant had "an ID in [his] wallet that [said he was] a hundred percent service-connected PTSD."

In light of defendant's testimony, the trial court instructed the jury on self-defense. After reviewing the exhibits and hospital records, the jury returned its guilty verdicts.

At sentencing, defendant stipulated to the prior offenses underlying his fourth-offense habitual status under MCL 769.12(1)(a). Both defense counsel and defendant described defendant's traumatic childhood and struggle with PTSD. The trial court acknowledged defendant's challenges, but determined his minimum sentence was controlled by statute and warranted in light of defendant's extensive criminal history. The court then imposed concurrent sentences of 25 to 40 years' imprisonment.

This appeal followed. After filing this appeal, defendant moved for a new trial or a hearing under *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), which the trial court denied.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends his trial counsel was ineffective. We disagree.

## A. STANDARDS OF REVIEW

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). "[A] trial court's factual findings in that regard are reviewed for clear error and cannot be disturbed unless 'the reviewing court is left with a definite and firm conviction that the trial court made a mistake.' " *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014), quoting *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). However, "because no *Ginther* hearing was held, our review is limited to mistakes apparent on the record." *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

## B. ANALYSIS

The Michigan and United States Constitutions guarantee criminal defendants the right to be represented by an attorney. Const 1963, art 1, § 20; US Const, Am VI. "The constitutional right to counsel is not merely the right to have a lawyer stand or sit nearby; rather, a criminal defendant has the right to the effective assistance of counsel." *People v Otto*, 348 Mich App 221, 231; 18 NW3d 336 (2023). "A defendant must meet two requirements to warrant a new trial

---

[11] In context, defendant appeared to be referring to Dr. Carlson, who is a psychologist, not a psychiatrist.

because of the ineffective assistance of trial counsel." *Armstrong*, 490 Mich at 289-290. "First, the defendant must show that counsel's performance fell below an objective standard of reasonableness. In doing so, the defendant must overcome the strong presumption that counsel's assistance constituted sound trial strategy." *Id*. at 290. "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015), quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Second, the defendant then must show that, "but for counsel's deficient performance, a different result would have been reasonably probable." *Armstrong*, 490 Mich at 290. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.

As related to trial, defendant contends that defense counsel was ineffective for failing to secure an expert confirming defendant's PTSD in order to establish his diminished capacity and for failing to inform Keeley of the court's sequestration order.

### 1. DEFENSE COUNSEL'S FAILURE TO OBTAIN AN EXPERT EVALUATION TO ESTABLISH DEFENDANT'S DIMINISHED CAPACITY

Defendant contends his "counsel was ineffective for failing to obtain a psychological evaluation by an expert who confirmed his PTSD and offering such evidence at trial as proof of his diminished capacity." We disagree.

Decisions about what evidence to present and whether to called witnesses are presumed to be matters of trial strategy. *People v Putnam*, 309 Mich App 240, 248; 870 NW2d 593 (2015). "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Odom*, 276 Mich App 407, 415; 740 NW2d 557 (2007). "We will not second-guess counsel on matters of trial strategy, nor we will assess counsel's competence with the benefit of hindsight." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). However, "a court must determine whether the 'strategic choices [were] made after less than complete investigation,' and any choice is 'reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Trakhtenberg*, 493 Mich at 52, quoting *Strickland*, 466 US at 690-691 (alteration in original).

In this case, defendant's trial counsel, his fifth attorney, filed a notice of intent to assert an insanity defense and moved for a competency examination as well as a criminal responsibility evaluation.[12] In part, counsel asserted that defendant's actions were not those of a reasonable and competent person and that defendant was a veteran who suffered from PTSD among other conditions. At a later hearing on the motion, defense counsel represented that defendant had "service-related" PTSD, was "100 percent disabled[,]" and had been "hospitalized a couple of

---

[12] Although defendant was charged in 2019, he was not bound over until July 2021. Fifth defense counsel's notice and motions were filed in August 2022, a little more than a month before the trial scheduled for September.

times[.]" The trial court adjourned the trial and granted defendant's motion, ordering both a competency examination and a criminal responsibility evaluation.

Dr. Carlson, a licensed psychologist, conducted a competency examination and determined that defendant was competent. She also performed a criminal responsibility evaluation. She reported that defendant had "a history of symptoms consistent with a depressive episode and PTSD," but opined that defendant's mental state at the time of the assault "was not characterized by a substantial disorder of thought or mood which significantly impaired his judgment, behavior, capacity to recognize reality or to meet the ordinary demands of life at the time of the alleged offense." In particular, Dr. Carlson reasoned that defendant was employed at the time of the assault, involved in a romantic relationship, had reunited with his mother, "noted no psychiatric symptoms during the legally relevant time period[,] and . . . was not receiving mental health treatment."

Dr. Carlson also discussed defendant's claim that he had blacked out during the time of the alleged offenses, explaining that his experience was not consistent with "genuine amnesia." And she further opined: "It is impossible to determine what [defendant] remembers or does not remember about the alleged offenses, versus what he chose to disclose." Likewise, "[i]t is impossible to know how his reported memory impairment may or may not be related to his diagnosis of PTSD, as he reported he only experiences black[]outs during physical altercations and during no other time periods."

Dr. Carlson concluded that defendant was not suffering from a mental illness; however, even if he was, "there were no indications in the available information that at the time of the alleged offenses [he] would have lacked the substantial capacity to appreciate the nature and quality or the wrongfulness of the alleged conduct or to conform his conduct to the requirements of the law," as required to establish an insanity defense under MCL 768.21a(1). Dr. Carlson opined that defendant made statements during the alleged offenses that "he wanted [Keeley] to be left alone by the alleged victim." This suggested that he understood that "his behavior was threatening and would contribute to the alleged victim no longer contacting his mother." Moreover, defendant "moved his camper to watch the alleged victim's interactions with [Keeley], suggesting an ability to conform his behavior and behave in a goal-directed manner." And, "[f]inally, [defendant] made statements to [the] police denying the allegations, suggesting an attempt to evade being charged with the alleged instant offenses."

Before trial, defendant filed his witness list and identified a representative from the local Department of Veteran's Affairs (VA) to verify documents confirming the status of defendant's service-related PTSD. On the first day of trial, the parties had a discussion in chambers about witnesses from the VA testifying. On the record, the prosecutor objected because he had received no records from the VA and because such evidence was irrelevant given that defense counsel was presenting a self-defense claim, not an insanity defense. And, while Dr. Carlson was listed on defendant's witness list, she had not been subpoenaed. Defense counsel ultimately agreed that no VA witnesses' names should be read to the jury.

On the second day of trial, in anticipation of opening statements, the prosecutor again noted that defense counsel had indicated that he was going to introduce evidence of defendant's PTSD. The prosecutor objected, explaining again that it had received nothing from the defense pertaining

to PTSD, and to the extent *People v Yost*, 278 Mich App 341; 749 NW2d 753 (2008), permitted such evidence, expert testimony was required. Moreover, if defense counsel was going to bring in Dr. Carlson, he had not subpoenaed her.

Defense counsel responded that PTSD was a lifetime condition for defendant. The prosecutor replied that if defense counsel was introducing character evidence, he would be opening the door to evidence involving prior incidents. After a short break, a review of *Yost*, and a discussion with defendant, defense counsel agreed that "at this point in time we are not going to go down that road." Relying on *Yost*, the trial court ordered defense counsel not . . . [to] introduce[e] any evidence or testimony regarding PTSD at this point."

Nevertheless, during defendant's redirect testimony, he mentioned telling a "[p]sychiatrist"[13] about the victim pulling a gun on him, blacking out, and his PTSD. On recross-examination, defendant testified about his "diagnosis of a hundred percent service-connected PTSD[,]" which was made in May 2022.[14] Defendant added: "I have an ID in my wallet that says I'm a hundred percent service-connected PTSD. It's in my wallet right now." Defendant further explained that he was "on some major medications for my hundred percent service-connected PTSD."

After defendant was convicted, current appellate counsel had him "referred for an evaluation and risk assessment" by Shannon Conz, another psychologist. Initially, this report cautioned: "Please note that a risk assessment is designed to determine an individual's risk of re-offending and is not to be used as a factor in determining guilt." But, in Conz's conclusion, she reported that defendant "was referred for an evaluation to determine his present risk of criminal

---

[13] In context, it appears that defendant was referring to Dr. Carlson, who is a psychologist, not a psychiatrist.

[14] The record includes a letter from the VA dated May 28, 2020, that was not presented during trial. In pertinent part, it reads:

> The records reflect that you are a Veteran of the Peacetime. You served in the Navy from July 28, 1986 to July 27, 1990. You filed a new claim for benefits that was received on January 17, 2020. Based on a review of the evidence listed below, we have made the following decision(s) on your claim.
>
> * * *
>
> 1. Service connection posttraumatic stress disorder (PTSD) with alcohol use and moderate cocaine use disorder is granted with an evaluation of 100 percent effective October 30, 2019.
>
> * * *
>
> 3. Service connection for anxiety disorder is denied.
>
> 4. Service connection for athlete's foot is denied.
>
> 5. Service connection for bowel resection surgery/colostomy scar is denied.

reoffending and the nature of his mental health." In part, Conz relied on defendant's self-reporting,[15] but she also conducted testing that showed defendant met the "criteria for a diagnosis of PTSD." Regarding the blackouts that defendant reported experiencing when he was angry, however, Conz opined that "his reports . . . do not suggest that he is experiencing dissociative symptoms related to PTSD." And, in conclusion, Conz opined that defendant "exhibit[ed] symptoms consistent with PTSD." Conz also acknowledged that some of defendant's symptoms were exacerbated by his substance abuse, however, she opined that the symptoms "caused him clinically significant impairment in social, occupational, or other important areas of functioning." Thus, Conz appeared to disagree with Dr. Carlson over whether defendant suffered from a mental illness. Conz did not opine whether defendant lacked the "substantial capacity either to appreciate the nature and quality or the wrongfulness of his . . . conduct or to conform his . . . conduct to the requirements of the law[,]" which are necessary to establish insanity under MCL 768.21a(1).

Attaching Conz's report as an offer of proof, defendant's appellate counsel filed a motion for new trial, contending that his trial counsel performed deficiently by failing "to investigate the issue of [defendant's] PTSD and at least arrange for an independent evaluation by an expert witness on that topic[.]" Appellate counsel further asserted that there was "a reasonable probability of a different outcome had the expert testified."

The prosecution responded that trial counsel had investigated defendant's PTSD and the documentation from the VA. See footnote 14. Regardless, the PTSD diagnosis was not relevant to defendant's defenses that he had permission to enter the victim's camper and that he acted in self-defense after the victim produced a weapon. Further, some of Conz's observations would not have been helpful to defendant, including: (1) defendant "has utilized anger and aggression, as well as substances, to cope with his emotions throughout his adult life," (2) "[h]is unresolved symptoms and his substance abuse have undoubtedly exacerbated mood disturbances and . . . fueled his lengthy history of difficulty curbing his behavioral outbursts, including the offense for which he is currently incarcerated," (3) defendant has "a history of irritable behavior and angry outbursts, typically expressed as verbal or physical aggression toward people or objects[.]" And, if defendant had offered such evidence, the prosecutor was prepared to delve into the details of defendant's prior violent assault.

After hearing defendant's motion for a new trial, the trial court denied it. The trial court assumed that counsel had performed deficiently; however, it determined that defendant had not established prejudice because he testified at trial that he had been diagnosed with PTSD. Therefore, any additional evidence about PTSD would have been cumulative. The trial court also noted that defendant did not offer "to show that blacking out or memory loss were known symptoms of PTSD." Finally, "[w]hatever affect PTSD had on . . . defendant's conduct at the time of the offense was also irrelevant to his claim of self-defense where the jury found beyond a reasonable doubt that he was guilty of a home invasion." See MCL 780.972(1) and (2).

On appeal, defendant now argues "[b]ecause trial counsel failed to obtain an expert evaluation or opinion confirming that [defendant] suffered from PTSD, he was unable to cite PTSD

_____

[15] Curiously, defendant told Conz that he "heard a click click and . . . thought [he] saw a gun[,]" but "[h]e later learned that the victim did not have a gun."

as an explanation as to why he acted as he did" at the time of the alleged assault and in court. In particular, defendant points to Conz's report as confirming defendant's PTSD diagnosis and that his PTSD impacted his ability to control his actions. Conz opined that defendant's "unresolved symptoms have undoubtedly exacerbated mood disturbances and has fueled his lengthy history of difficulty curbing his behavioral outbursts, including the offense for which he is currently incarcerated."

The prosecutor now recognizes that "[a] defendant's psychological idiosyncrasies may, at least in theory, be relevant to the reasonableness of the defendant's belief that he . . . was in danger" for purposes of demonstrating that he acted in self-defense. *People v Orlewicz*, 293 Mich App 96, 102; 809 NW2d 194 (2021), remanded on another ground 493 Mich 916; 823 NW2d 428 (2012). However, the prosecutor contends that because the parties presented diametrically opposed views of what occurred and the proposed testimony would not be relevant to establishing which version was credible, as in *Orlewicz*, the proposed testimony is irrelevant. *Id*. at 103. Regardless, the prosecutor also asserts that trial counsel did not perform deficiently because both reports by Dr. Carlton and Conz presented challenges for defendant for the reasons previously discussed, including characterizing defendant as being incapable of controlling his aggression and opening the door to his prior assaultive behaviors. Nor has defendant shown a reasonable probability of a different outcome because, under *Orlewicz*, the evidence was irrelevant, and counsel is not ineffective for failing to make a futile request. Finally, because the experts' testimony would not have been favorable to defendant, defense trial counsel did not perform deficiently in failing to present either expert as a witness.

We note that both proposed experts recognized that defendant had PTSD; however, neither could explain his claimed amnesia. Dr. Carlson stated that it was "impossible to determine what [defendant] remembers or does not remember about the alleged offenses, versus what he chose to disclose" and Conz recognized that defendant's PTSD did "not suggest that he [was] experiencing dissociative symptoms related to" it. Further, both experts' evaluations contained additional negative information about other assaults as well as substance and alcohol abuse. Under the circumstances, defense counsel's decision not to call Dr. Carlson, who was named on his witness list, was a matter of trial strategy. *Trakhtenberg*, 493 Mich at 52. And, even if counsel had performed deficiently by failing to call an expert to testify about defendant's PTSD, defendant cannot establish that he was prejudiced. As noted, during the trial, defendant repeatedly testified that he had been diagnosed with PTSD resulting from his military service. On this record, the jury was aware that defendant had been determined to be disabled by PTSD due to his military service. Therefore, defendant has not met his burden of establishing that his trial counsel performed deficiently and that he was prejudiced. *Strickland*, 466 US at 694; *Armstrong*, 490 Mich at 290.

For the first-time on appeal, defendant also argues his trial counsel was ineffective for failing to call an expert witness on PTSD in order to present a diminished-capacity defense.[16] But,

---

[16] Counsel's decision regarding the defense to be pursued is a matter of trial strategy. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995) (determining that a counsel "faced with a choice between two defenses with significant evidentiary problems" may elect to pursue one over the other). And a reviewing "court cannot conclude that merely because a trial strategy backfires,

-11-

our Supreme Court declined to recognize a diminished-capacity defense in *People v Carpenter*, 464 Mich 223, 239; 627 NW2d 276 (2001), holding:

> Like the Supreme Court of Ohio, we decline to adopt an alternative defense to legal insanity that could swallow up the insanity defense and its attendant commitment provisions. The concepts of both diminished capacity and insanity involve a moral choice by the community to withhold a finding of responsibility and its consequence of punishment. Accordingly, we hold that the insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation. [*Id.* (quotations, citations, and alterations omitted.)]

"[O]ur Supreme Court observed that the Legislature had enacted a comprehensive statutory scheme concerning defenses based on either mental illness or mental retardation." *Yost*, 278 Mich App at 354. "The enactment of this scheme, our Supreme Court concluded, demonstrated the Legislature's intent to preclude the use of any evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent." *Id.* (quotations and citations omitted.)

Defendant concedes *Carpenter* is good law, but relies on then-Justice Cavanagh's dissent from an order denying a defendant's challenge to *Carpenter*'s validity in *People v Tyson*, 511 Mich 1080, 1086-1089 (2023) (CAVANAGH, J., dissenting), to support his claim defense counsel was ineffective for failing to raise a diminished-capacity defense. *Tyson* was issued three months before defendant's trial began and the denial of an application for leave to appeal is not binding. *Bates v Gilbert*, 479 Mich 451, 462 n 6; 736 NW2d 566 (2007). Although Justice Cavanagh's dissent to the *Tyson* order supports defendant's position, it is not binding law. In contrast, this Court is bound to follow the decisions of the Michigan Supreme Court that have not been reversed or modified. *People v Adamowicz*, 346 Mich App 213, 221; 12 NW3d 35 (2023). For now,[17] *Carpenter* remains good law that this Court is bound to follow. *Id.*

"Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Consequently, defendant has not established either deficient performance or prejudice from his trial counsel failing to advance a diminished-capacity defense that does not exist under current Michigan caselaw. *Id.*

---

effective assistance of counsel is denied." *People v Strong*, 143 Mich App 442, 449; 372 NW2d 335 (1985).

[17] We are aware that *People v Madison*, ___ Mich ___; 12 NW3d 440 (2024) (Docket No. 167120), is currently pending on leave granted before our Supreme Court and will address the question of whether *Carpenter* was correctly decided and, if not, whether it should be retained.

## 2. INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO INFORM A DEFENSE WITNESS ABOUT THE TRIAL COURT'S SEQUESTRATION ORDER

Defendant next contends that his trial counsel performed deficiently by failing to inform Keeley of the trial court's sequestration order. Defendant also asserts that his counsel's deficient performance resulted in Keeley's credibility being diminished and created a reasonable probability of a different outcome at trial, warranting a new trial. While we agree that counsel performed deficiently, we disagree that there was a reasonable probability of a different outcome.

On the second day of trial, the court verbally granted the prosecution's request for mutual sequestration of the witnesses with an exception made for Deputy Ross, the officer-in-charge, under MRE 615. The next day, Keeley, who was a witness for the defense, came to court and sat in the courtroom during part of the victim's testimony, during Deputy Ross's testimony, and during defense counsel's opening statement. Defense counsel admitted that he did not notice Keeley entering the courtroom and erred when he failed to advise her of the sequestration order before her testimony. On appeal, the prosecution asserts that defendant's trial counsel did not perform deficiently because he did not notice Keeley enter the courtroom. But we conclude that defense counsel performed deficiently because knowing that Keeley would be a defense witness and that the prosecution had not concluded its case, defense counsel should have advised Keeley not to enter the courtroom until she was called to ensure compliance with the court's sequestration order. See *Armstrong*, 490 Mich at 290.

Nevertheless, defendant must also demonstrate "but for counsel's deficient performance, a different result would have been reasonably probable." *Id.* Defendant argues Keeley's testimony corroborated his version of events and her credibility was diminished by her violation of the sequestration order, prejudicing his defense.

We begin by noting that during defense counsel's questioning of Keeley, she confirmed that no one told her not to come into the courtroom and testified that she could hardly hear the morning's testimony when she was inside the courtroom. Moreover, Keeley testified that she was there to tell the truth. Thus, it is unclear whether the jury would have held the violation of the court's verbal sequestration order against her when she was unaware of it.[18] Indeed, defendant

---

[18] We recognize that there were certainly other reasons for the jury to conclude that Keeley was not credible. First, she testified multiple times she was heavily medicated on the night of the offense. Second, she stated she was groggy and could not remember giving her name to Deputy Ross at the hospital, explaining that if she spelled it incorrectly, "it was an accident because [she] couldn't even like talk very good." Third, Keeley did not know whether she gave Deputy Ross the wrong telephone number for defendant, but, if she did, it was because she could not remember telephone numbers, even her own. And, even if she looked through her phone for the number, she did not have her glasses on. Fourth, Keeley also admitted she had difficulty remembering the assault, stating: "That's four years ago. Can't even remember my name." Fifth, Keeley later testified that she had a good memory "[s]pecifically from four years ago[.]" Sixth, Keeley then said that she was not serious when she testified that she could not even remember how to spell her

speculates that the jury wholly disregarded Keeley's testimony due to the violation of the sequestration order. But defendant's position is contrary to the trial court's instruction that it was for the jury to determine whether the violation tainted her credibility as well as our caselaw presuming that jurors follow their instructions. *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020).

Significantly, Keeley was not present during the commission of the charged crimes and there was other strong evidence of defendant's guilt. During trial, defendant claimed that after speaking with Keeley at around midnight or 12:30 a.m.,[19] he entered the victim's home twice with the victim's permission and that he acted in self-defense, blacking out after hearing what he thought was a gun racking or a gun safety being released. There is also no dispute that the victim was savagely beaten. He suffered two breaks to his left arm, severe bruising to his chest, neck, and face, a cut on his forehead, and two cracked ribs. The victim's injuries were consistent with his description of being grabbed by the neck, pinned down, and battered by hands and fists. Blood spatter on the blinds behind the couch, on a cabinet on top of the couch, and on the inside of the front door supported the victim's testimony that he was assaulted in the area of the couch. Defendant and Keeley provided motive for such an attack, opining that the victim had behaved inappropriately with Keeley, defendant's mother, who was in a fragile state due to her boyfriend's suicide. Even the victim described Keeley and himself as being flirtatious with one another and admitted that he may have patted her butt. Also notable was defendant's failure to inform the police about the presence of a gun or about acting in self-defense despite the fact that he was on probation. Instead, defendant admitted that he had lied to Deputy Ross about his whereabouts on the night of the entry and assault, offering that his girlfriend was an alibi witness. See *People v Arnold*, 43 Mich 303; 5 NW 385 (1880) ("It was never doubted that the conduct of a suspected party, when charged with a crime, may be put in evidence against him, when it is such as an innocent man would not be likely to resort to. Thus, it may be shown that he made false statements for the purpose of misleading or warding off suspicion."); *People v Wolford*, 189 Mich App 478, 481-482; 473 NW2d 767 (1991) ("The trial court did not err in instructing the jury that it could consider [the] defendant's false statement to the police as evidence of guilt."); *People v Dandron*, 70 Mich App 439, 442-445; 245 NW2d 782 (1976) (a false exculpatory statement may be admitted as circumstantial evidence of guilt). Defendant even offered a second false statement to Deputy Ross to exculpate himself. Specifically, defendant reported that he had heard that the victim was "jumped" and that Keeley had done it. Defendant went so far as to offer that 70-year-old Keeley was capable of so savagely assaulting the 6' 2", 180-pound male victim, explaining that she had "beat up" another man and she fought "like a man." And, soon after the entry and assault, but before defendant was even charged, Keeley sent defendant texts reflecting that he was "mean" when he drank and that "[e]verybody here knows what you did." Defendant also increased the number of times he entered the victim's house with permission from once to twice. Considered together, there is strong evidence of defendant's guilt, and we conclude that defendant has not met his burden of establishing that "but for counsel's deficient performance, a different result would

___

name. Seventh, Keeley sent text messages to defendant confronting him about how his drinking made him "mean" and reflecting that everyone knew what he had done.

[19] The victim testified that it was closer to 3:00 a.m.

-14-

have been reasonably probable" at trial. *Armstrong*, 490 Mich at 290. Thus, his ineffective assistance of counsel claim fails. *Id.*

## III. THE TRIAL COURT'S LIMITING INSTRUCTION

Defendant contends that the trial court erred when it read a curative instruction that appeared to suggest that Keeley intentionally violated its sequestration order rather than attributing her violation to trial counsel's failure to inform her of the order. We conclude that defendant waived this issue.

"In order to waive a known right, a party must 'clearly express[ ] satisfaction with a trial court's decision . . . .' " *People v Davis*, 509 Mich 52, 64; 983 NW2d 325 (2022), quoting *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) (alterations in original). Consequently, "[w]hen counsel affirmatively approves a jury instruction, . . . he or she waives any error." *People v Hershey*, 303 Mich App 330, 349; 844 NW2d 127 (2013).

In this case, the trial court informed the parties, outside of the jury's presence, that it would give the following instructions to address Keeley's violation of its sequestration order:

> Ladies and gentlemen, at the beginning of the trial in this matter, this Court entered an order which prevented witnesses that were known to the parties to be testifying in this case from sitting in the courtroom and observing the proceedings and the testimony of other witnesses. This is called a sequestration order.
>
> Orders of the Court are to be followed. The purposes of sequestering a witness are to prevent him or her from coloring his or her testimony to conform with the testimony of another and to aid in detecting testimony that is less than candid. The Court has made a determination that the sequestration order in this case has been violated and that a witness, Muriel Keeley, has been present in the courtroom and has observed trial proceedings and the testimony of other witnesses despite the Court's order prohibiting her from doing so.
>
> You will receive an instruction at the conclusion of the trial that deals with the concept of the credibility of witnesses. You may consider the fact that this Court has determined that Muriel Keeley has been present in court despite an order commanding her not to do so. How that impacts her testimony or your perception of her testimony will ultimately be for you as jurors to decide.

After the trial court offered the attorneys an opportunity to object to its proposed instructions, defense counsel responded: "No. Thank you, Your Honor." Having agreed to the jury instruction, defense counsel waived any error, *Hershey*, 303 Mich App at 349, and defendant is not entitled to relief.

## IV. SENTENCING ISSUES

## A. DISPROPORTIONATE SENTENCE

Defendant argues the trial court's sentence was disproportionate, not individualized, and, therefore, unconstitutional. We disagree.

## 1. STANDARD OF REVIEW

"This Court reviews the proportionality of a trial court's sentence for an abuse of discretion." *People v Foster*, 319 Mich App 365, 375; 901 NW2d 127 (2017). "A given sentence constitutes an abuse of discretion if that sentence violates the principle of proportionality, which requires that the sentence be proportional to the seriousness of the circumstances surrounding the offense and offender." *People v Lowery*, 258 Mich App 167, 172; 673 NW2d 107 (2003).

## 2. ANALYSIS

Defendant argues the "mechanical application of such a huge mandatory minimum sentence" violated proportionality standards. We disagree.

Defendant was sentenced as a fourth or subsequent habitual offender under MCL 769.12(1)(a), which, in pertinent part, reads:

> (1) If a person has been convicted of any combination of 3 or more felonies or attempts to commit felonies, whether the convictions occurred in this state or would have been for felonies or attempts to commit felonies in this state if obtained in this state, and that person commits a subsequent felony within this state, the person shall be punished upon conviction of the subsequent felony . . . as follows:

> (a) If the subsequent felony is a serious crime or a conspiracy to commit a serious crime, and 1 or more of the prior felony convictions are listed prior felonies, the court shall sentence the person to imprisonment for not less than 25 years. Not more than 1 conviction arising out of the same transaction shall be considered a prior felony conviction for the purposes of this subsection only.

MCL 769.12(6)(c) defines a "serious crime" as including "an offense against a person in violation of" MCL 750.84 or MCL 750.110a(2). Thus, both AWIGBH, MCL 750.82, and first-degree home invasion, MCL 750.110a(2), are serious crimes. Defendant was also previously convicted of the following felonies: (1) operating while intoxicated (OWI), third-offense in 2003, MCL 257.625(9)(c), (2) OWI, third-offense in 2008, and (3) attempted assault by strangulation or suffocation, MCL 750.84(1)(b) and (2); MCL 750.92, in 2013. MCL 769.12(a)(*iii*) defines a listed prior felony as including an attempt to violate MCL 750.84. Thus, defendant was properly subjected to the mandatory 25-year minimum sentence for the instant AWIGBH and first-degree home-invasion convictions, each a serious crime under MCL 769.12(6)(c), because he had three prior felony convictions, including one for a listed offense, attempted assault by strangulation or suffocation.

-16-

" 'Legislatively mandated sentences are presumptively proportional and presumptively valid.' " *People v Burkett*, 337 Mich App 631, 637; 976 NW2d 864 (2021), quoting *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011). And, " '[i]n order to overcome the presumption that the sentence is proportionate, a defendant must present unusual circumstances that would render the presumptively proportionate sentence disproportionate.' " *Burkett*, 337 Mich App at 637, quoting *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). " 'Unusual' means 'uncommon, not usual, rare.' " *People v Ventour*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 363922); slip op at 8, quoting *People v Sharp*, 192 Mich App 501, 505; 481 NW2d 773 (1992).

"The principles that guide proportional sentencing in our state are: '(a) the reformation of the offender, (b) protection of society, (c) the disciplining of the wrongdoer, and (d) the deterrence of others from committing like offenses.' " *People v Bennett*, 335 Mich App 409, 418; 966 NW2d 768 (2021), quoting *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972). As this Court recently explained: "Although the mandatory 25-year minimum sentence is long, it likewise reflects a rational legislative judgment, entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated." *Burkett*, 337 Mich App at 642 (quotation marks and citation omitted).

Defendant contends the trial court failed to consider his PTSD and traumatic childhood when it imposed his sentences. Review of the record reflects that the trial court was aware of defendant's circumstances[20] after reviewing the presentence investigation report. The trial court also referenced the *Snow* factors before it explained that defendant's experiences and PTSD did not excuse what occurred here or in all of defendant's prior convictions that involved violence.[21] Further, the court noted defendant's numerous law enforcement contacts, which began in 1989, before it imposed the mandated minimum sentence under MCL 769.12(1)(a).

Defendant also argues that his age (55 at sentencing) and the fact that he had a child rendered the statutorily-mandated minimum sentence disproportionate. Defendant does not address how his age or having a teenager are unusual circumstances. Cf. *Bowling*, 299 Mich App at 558-559 (the 49-year-old defendant's age was insufficient to overcome "the presumptive proportionality of his sentences, especially considering his lengthy criminal record and the gravity of his offenses."). Because defendant fails to rebut the presumption of proportionality, his sentences are not disproportionate or unreasonable. Thus, the trial court did not abuse its discretion

---

[20] We recognize that defendant failed to mention that he was purportedly stabbed during an assault that occurred while he was in the Navy to the presentence report writer or the trial court; regardless, the trial court was aware that defendant was physically assaulted from the presentence report.

[21] In addition to the felony offenses already listed, defendant had two prior felony convictions and 27 prior misdemeanor convictions. Although many of the misdemeanor convictions involved drinking and driving without a license, defendant was also convicted of possession of a switchblade, harassment, assault and battery, domestic violence, and attempted resisting and obstructing. Defendant was also on probation for a felony drug possession charge when he committed the crimes at issue here.

by imposing the statutorily-mandated 25-year minimum sentence under MCL 769.12(1)(a) with a 40-year maximum sentence. *Burkett*, 337 Mich App at 642; *Lowery*, 258 Mich App at 172.

## B.  INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

Lastly, defendant contends that his trial counsel was ineffective at sentencing for failing to provide evidence of mitigating factors during sentencing.  We disagree.

Again, it is defendant's burden to demonstrate his counsel's performance was deficient. *Armstrong*, 490 Mich at 290.  Although defendant contends that his counsel failed to provide evidence of factors mitigating his sentence, the record reflects that counsel addressed: (1) defendant's traumatic childhood, including his abusive parents, his exposure to substance and alcohol abuse, and his father's suicide, (2) PTSD from defendant's Navy service, and (3) the underlying factual circumstances, including defendant's belief that he was invited into the victim's camper and that he had no intention of harming the victim.  Moreover, during sentencing, counsel said: "So based upon all of that history and the incidents that night, it seems that the guidelines[22] would be more proportional in this event, but we understand the statute."  Stated otherwise, despite recognizing that the law required a mandatory-minimum 25-year sentence, defense counsel voiced that a within-the-guidelines sentence would be more proportionate.

On this record, defendant has not met his burden of showing that counsel's performance was deficient.  And, even if defendant had met that burden, he has not shown that he was prejudiced because MCL 769.12(1)(a) required imposition of the mandatory 25-year minimum sentence. Accordingly, defendant's ineffective-assistance-of-counsel claim fails.  *Armstrong*, 490 Mich at 290.

Affirmed.

/s/ Anica Letica
/s/ Michelle M. Rick
/s/ Mariam S. Bazzi

---

[22] The sentencing guidelines for first-degree home invasion recommended minimum sentence of 84 to 280 months' imprisonment and the minimum sentence imposed was 25 years or 300 months.